UNITED STATES of America, Plaintiff-Appellee,

v.

Julius L. ECHELES, Defendant-Appellant.

No. 14774.

United States Court of Appeals Seventh Circuit.

Sept. 2, 1965.

Rehearing Denied Dec. 1, 1965.

Rehearing Denied Dec. 1, 1965. (En Banc).

Albert E. Jenner, Jr., Thomas P. Sullivan, John C. Tucker, Kenneth S. Broun, Chicago, Ill., Raymond, Mayer, Jenner & Block, Chicago, Ill., of counsel for appellant.

Edward V. Hanrahan, U. S. Atty., John Peter Lulinski, John Powers Crossby, Raymond F. Zvetina, Asst. U. S. Attys., for appellee.

Before CASTLE and KILEY, Circuit Judges, and GRANT, District Judge.

GRANT, District Judge.

This is an appeal by Julius L. Echeles, a member of the bar of Illinois and of this Court, from a verdict and a judgment thereon finding him guilty of suborning perjury, impeding administration of justice and conspiracy in violation of Sections 1622, 1503 and 371, Title 18, of the United States Code.[1]  The respective

---

1. The pertinent part of the statutes involved are as follows:

§ 1622. *Subornation of perjury.* Whoever procures another to commit any perjury is guilty of subornation of perjury, and shall be fined not more than $2,000 or imprisoned not more than five years, or both.

§ 1503. *Influencing or injuring officer, juror or witness generally.* Whoever corruptly, or by threats or force * * * endeavors to influence, intimidate, or impede any witness, in any court of the United States * * * or corruptly or by threats or force * * * endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

§ 371. *Conspiracy to commit offense or to defraud United States.* If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or im-

violations allegedly occurred during the trial of United States v. Isaac Hill and Broadway Arrington,[2] a narcotics case, in which appellant Echeles served as attorney for one of the defendants, Broadway Arrington. In this appeal, appellant asserts three general assignments of error and places principal reliance on the contention that the Government did not establish a *prima facie* case against him for the reason that there was no evidence introduced at the trial from which it could reasonably be inferred that appellant knew of the perjury, or knew the witnesses involved intended to commit perjury or had falsified the record, such knowledge constituting an essential ingredient of the offense charged. Our review of the record, however indicates that the evidence on this issue was of such substance to warrant its submission to the jury and that the inferences drawn therefrom by the jury cannot be said to be unreasonable. Yet, we do find error in the denial by the trial court of appellant's motion for separate trial to be of sufficient gravity to compel reversal of appellant's conviction and remandment to the court below for new trial on all the issues.

The facts most relevant to disposition of this case on the ground stated are as follows: Broadway Arrington was indicted with others for conspiracy to violate the federal narcotics laws, it being alleged that in late April, 1961, Arrington sold narcotics to Marvin Moses at Chicago, Illinois. Moses was the only government witness to the alleged sale. As already noted, Julius Echeles was counsel for defendant Arrington.

Broadway Arrington's defense was an alibi. He asserted that he was in Hot Springs, Arkansas, at the time of the alleged transaction with Moses; specifically, that he was a guest in Pat Carr's Motel in Hot Springs from April 6 to April 29, 1961.

Two witnesses, Pat Carr, the owner of the motel in Hot Springs, and Lucille Smith, a former clerk at the motel, testified, in support of Arrington's defense, that Arrington was in fact a guest at Carr's Motel from April 6 to 29, 1961. They identified a corroborating motel registration card as the one that had been prepared by Mrs. Smith in the regular course of business during Arrington's stay. Arrington took the stand in his own defense and testified that he had signed the motel registration card on April 6, 1961, and that he stayed at the motel until April 29. Both Carr and Arrington testified that they had an independent recollection that Arrington and a man named Holmes had been in Hot Springs at the end of March, 1961, at which time they signed a contract to purchase a parcel of realty from a man named Cain, and that Carr had acted as broker in the transaction. Carr testified that Arrington had returned to Hot Springs in April to make arrangements with regard to the property which Arrington and Holmes had contracted to buy.

Three days after Carr and Smith had testified in support of Arrington's alibi, they were recalled to testify as Government rebuttal witnesses. They confessed that their prior testimony relating to Arrington's stay at Carr's Motel in Hot Springs in April, 1961, was false, and that the registration card was spurious, it having been prepared at Arrington's home in Chicago on May 24, 1963, the day they testified on Arrington's behalf. The card was filled out by Mrs. Smith in the presence of Carr, Arrington and Arrington's daughter Barbara O'Neil, before Arrington took them to Echeles' office, where they reviewed their testimony before they went to court. When asked, "Who told you to identify that card there as being a record of your motel?", Carr answered, "The lawyer."

prisoned not more than five years, or both. * * *

2. The trial in this case commenced on May 21, 1963, before the United States District Court for the Northern District of Illinois, Eastern Division, the Honorable Julius J. Hoffman, United States District Judge, presiding. The case was given the number 62 CR 522 by that court.

Arrington then took the stand again in surrebuttal. He admitted that the registration card was not authentic, that he had not signed it in April, 1961, as he had testified, and that it had been prepared at his home, as Carr and Smith testified. He persisted, however, in his testimony that he had been in Hot Springs from April 6 to 29, 1961. Arrington also testified at that time that Echeles had nothing to do with falsifying the motel record. The colloquy in this respect was as follows:

*Question*: Showing you Defendant's Exhibit 4, Defendant Arrington's Exhibit 4, did your lawyer, Mr. Echeles have anything to do with the preparation of that card?

*Answer*: No, sir, he didn't.

The day after giving the foregoing testimony, May 29, 1963, and before the case went to the jury, Arrington entered a plea of guilty. At the time he entered the plea, Arrington again stated that Echeles had nothing to do with the preparation of the false registration card or with the perjured testimony:

*The Court*: Mr. Arrington, the law gives you the right to speak in your own behalf. I give you the privilege of saying anything you would like to say.

\* \* \* \* \* \*

*Defendant Arrington*: I have never been in prison before and I am ashamed. I would appreciate if you would do the best you can for me. I want to say one other thing, Judge, Mr. Carr didn't tell the truth on Mr. Echeles when he testified from the stand. Mr. Echeles didn't tell him to say anything. He asked him a few questions, how long he had been in Hot Springs, things like that. That didn't tell him no testimony in this trial. That's all I have to say.

Thereafter, on June 27, 1963, upon his plea of guilty Arrington was sentenced to 12 years imprisonment. At the time of his sentencing, Arrington made the following statements in open court:

*The Court*: And you—I want to test your intelligence here. When you took the witness stand in the case where you were tried and in which you pleaded guilty after the trial had progressed, you took the witness stand and said that you— you admitted that the testimony you had given in respect to your Hot Springs visit was not true, didn't you?

*Defendant Arrington*: Yes, but I mean about the card—

*The Court*: And you said then that Mr. Echeles did not tell you to do that, isn't that right?

*Defendant Arrington*: He didn't tell the clients what to do.

*The Court*: He didn't tell you what to do about that, did he? You said that from the witness stand and you said it right at the same lectern at which you stand now, isn't that right?

*Defendant Arrington*: Yes, sir.
*The Court*: That is right, isn't it?
*Defendant Arrington*: Yes, sir.

The Government submitted this matter to the September, 1963 federal grand jury in Chicago. The grand jury eventually returned an indictment against Echeles, Arrington and Mrs. O'Neil in five counts. Count One involved Arrington only. It charged a violation of Title 18, Section 1621, in that Arrington committed perjury on May 27, 1963, during his narcotics trial, by testifying that on April 6, 1961, he signed a registration card of Carr's Motel, Hot Springs, Arkansas, and that he had not signed the card on or about May 24, 1963.

Count Two charged that on or about May 24, 1963, Julius L. Echeles and Broadway Arrington knowingly procured Pat Carr to testify falsely at the Arrington trial that (a) Arrington was in Hot Springs from April 6, 1961, to April 29, 1961, to purchase some property from Pat Carr; (b) on April 6, 1961, Arrington signed a registration card of Carr's Motel; (c) the registration card had been in the care and control of Carr's

Motel from April 6, 1961, until produced on the trial in the Arrington narcotics case; and (d) the card was an authentic record of the motel—all in violation of Title 18, Section 1622 of the United States Code.

Count Three charged that on or about May 24, 1963, Echeles and Arrington knowingly procured Lucille Smith to give the same false testimony at the Arrington narcotics trial as specified in Count Two, with the exception of (a). Such also constituted a violation of Title 18, Section 1622.

Count Four, charging a violation of Title 18, Section 1503, alleged that on or about May 24, 1963, Echeles and Arrington knowingly endeavored to induce Pat Carr and Lucille Smith to testify falsely at the Arrington trial.

Count Five charged that from on or about May 13, 1963, to on or about May 29, 1963, Echeles, Arrington and Barbara O'Neil knowingly conspired to commit the crimes alleged in Counts Two, Three and Four.

The only overt act charged to have been committed by Echeles was a conversation on or about May 24, 1963, among Echeles, Arrington, O'Neil, Carr and Smith (in Echeles' office), at Chicago, Illinois. Such act was alleged to have constituted a violation of Section 371 of Title 18, prohibiting conspiracy to commit an offense against the United States.

All three defendants named in the indictment thereafter entered pleas of not guilty. Then, on November 15, 1963, appellant individually filed a motion for separate trial, basing said motion on three grounds: (1) that he, Echeles, would be prejudiced by the admission in evidence of statements of co-defendant Arrington which may constitute admissions under Count One of the indictment; (2) that a joint trial would deprive him of his right to call his co-defendants as witnesses; and (3) that the Government may have coerced co-defendants into making statements inculpatory of him, which though not admissible against him

would be admissible against the declarant, to defendant Echeles' prejudice. The motion for severance was denied by the trial judge from the bench on January 29, 1964.

■ It is to the sound discretion of the trial court that a motion for separate trial is addressed. Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); United States v. Shotwell Mfg. Co., 287 F.2d 667 (7th Cir. 1961), aff'd 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed. 2d 357 (1963); United States v. Kramer, 236 F.2d 656 (7th Cir. 1956). It is also quite clear that this discretion is subject to review and correction only if abused. Olmstead v. United States, 19 F.2d 842, 53 A.L.R. 1472 (9th Cir. 1827), aff'd 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928); Gorin v. United States, 313 F.2d 641 (1st Cir. 1963); United States v. Haupt, 136 F.2d 661 (7th Cir. 1943). The problems arising out of such motions for separate trial frequently confront the courts in conspiracy cases, where the general rule has evolved that persons jointly indicted should be tried together, Hall v. United States, 83 U.S.App.D.C. 166, 168 F.2d 161, 163, 4 A.L.R.2d 1193 (1948), cert. den. 334 U.S. 853, 68 S.Ct. 1509, 92 L.Ed. 1775 (1948), particularly so where the indictment charges a conspiracy or a crime which may be proved against all the defendants by the same evidence and which results from the same or a similar series of acts. United States v. Lebron, 222 F.2d 531, 535 (2d Cir. 1955), cert. den. 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774 (1950); United States v. Cohen, 124 F.2d 164, 165–166 (2d Cir. 1941), cert. den. sub nom. Bernstein v. United States, 315 U.S. 811, 62 S.Ct. 796, 86 L.Ed. 1210 (1942). Nevertheless, a single joint trial, however desirable from the point of view of efficient and expeditious criminal adjudication, may not be had at the expense of a defendant's right to a fundamentally fair trial. Barton v. United States, 263 F.2d 894, 898 (5th Cir. 1959); United States v. Kahaner, 203 F.Supp. 78, 80–81 (S.D. N.Y.1962); Schaffer v. United States, 221 F.2d 17, 19, 54 A.L.R.2d 820 (5th

Cir. 1955); United States v. Haupt, supra, 136 F.2d at 671; Hale v. United States, 25 F.2d 430, 438–439 (8th Cir. 1928). What constitutes abuse of discretion in terms of safeguarding each defendant's rights in such cases necessarily depends upon the facts in each particular case. Schaffer v. United States, supra, 221 F.2d at 19; United States v. Kahaner, supra, 203 F.Supp. at 81; Brady v. United States, 39 F.2d 312, 313 (8th Cir. 1930).

■ In the proceedings below, defendant Echeles was the occupant of what has been termed the "uneasy chair" generally reserved for co-defendants in a conspiracy trial. Krulewitch v. United States, 336 U.S. 440, 454, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (concurring opinion of Mr. Justice Jackson). That is, Echeles, as he stated in the first of the three grounds tendered in support of his motion for severance, faced the prospect of defending himself in a trial in which admissions would be introduced into evidence against his co-defendant, Arrington, which, Echeles feared, would prejudice his own defense. However, it has repeatedly been held that this alone, even where the admissions incriminate other defendants, is not sufficient to enable movant to gain a separate trial as a matter of right. United States v. Caron, 266 F.2d 49, 51 (2d Cir. 1959); Hall v. United States, supra, 168 F.2d at 163; Catano v. United States, 167 F.2d 820, 823 (4th Cir. 1948).

■ Yet, the incriminatory nature of the admissions against his co-defendants was not the whole of Echeles' problem in defending himself in the joint trial. For it appeared that, in a trial with Arrington as a co-defendant, Arrington having made statements in open court exculpatory of Echeles, Echeles would be unable to call this co-defendant to the stand for the purpose of getting the same or similar statements holding Echeles blameless into evidence. It is this circumstance, which constituted the second of the three grounds upon which Echeles based his motion for severance, together with the otherwise inconclusive nature of the first

such ground, that compels this Court to find error in the trial court's denial of said motion for a separate trial.

■ The Government contends that Echeles' failure to call or attempt to call Arrington as a witness precludes any claim of error in this Court, citing United States v. Vasen, 222 F.2d 3 (7th Cir. 1955). The Vasen case, however, has nothing to do with severance or with the problem presented in this case, and we do not find it controlling. Moreover, this contention misconceives one of the two fundamental protections afforded by the Fifth Amendment right against self-incrimination. By its first and most familiar protection, this Fifth Amendment provision gives any person the right to refuse to answer questions which might tend to incriminate him. But equally important is the "universally held" interpretation of this right prohibiting any person who is on trial for a crime *from being called to the witness stand*. 8 Wigmore on Evidence 406 (Claim of Privilege, § 2268); McCormick on Evidence 257–259 (Self-Incrimination, § 124) (1954). The second protection applies without regard to the nature of the intended inquiry; that is, a defendant on trial cannot be required to take the stand to answer even the most innocuous, non-incriminating inquiries. Nor does it make a difference whether the defendant is called to the stand by the prosecution or a co-defendant. 8 Wigmore on Evidence 410 (Claim of Privilege, § 2268).

This distinction was discussed in United States v. Housing Foundation of America, Inc., 176 F.2d 665, 666 (3rd Cir. 1949), wherein the court reversed because, over objection, one defendant had been permitted to call the other to the stand. Holding that such constituted "so fundamental an error that the judgment must be reversed and a new trial ordered", the court said:

   * * * The error made arises from confusing the privilege of any witness not to give incriminating answers with the right of the accused not to take the stand in a criminal

prosecution against him. Both come within the protection of the clause of the 5th Amendment which provides: "No person * * * shall be compelled in any criminal case to be a witness against himself." The plain difference between the privilege of witness and accused is that the latter may not be required to take the stand at all. * * *

See also, to the same effect: United States v. Keenan, 267 F.2d 118, 126 (7th Cir. 1959), cert. den. 361 U.S. 863, 80 S.Ct. 121, 4 L.Ed.2d 104 (1959); United States v. Benjamin, 120 F.2d 521, 522 (2d Cir. 1941); Poretto v. United States, 196 F.2d 392, 394 (5th Cir. 1952).

■ Thus, Echeles could not properly call Arrington as a witness during Echeles' case in chief. For if Arrington declined to take the stand, as was his right, Echeles' action in calling him and forcing him to decline to do so in front of the jury would have injected prejudicial error into the record as to Arrington. In De Luna v. United States, 308 F.2d 140, 141, 1 A.L.R.2d 969 (5th Cir. 1962), wherein it was held that the defendant had the constitutionally guaranteed right of silence free from prejudicial comments, even when they came only from co-defendant's attorney, the court said in language applicable here:

* * * If an attorney's duty to his client should require him to draw the jury's attention to the possible inference of guilt from a co-defendant's silence, the trial judge's duty is to order that the defendants be tried separately.

The Government further contends that Echeles' position in support of his motion for severance necessarily involved indulgence in two speculative assumptions: first, that Arrington would be tried prior to Echeles, and secondly, that Arrington would not claim his Fifth Amendment privilege against self-incrimination if called as a witness in the trial of Echeles. As for the first such "assumption", we do not feel it would have been egregious had the trial judge, after granting the motion

for separate trial, also directed the Government to proceed first with the case against Arrington.

With regard to the question of whether or not Arrington would claim the privilege if he were called as a witness during a trial of Echeles alone—a trial held subsequent to his own—we can only say that such question was not properly the Government's to interpose. Speculation about what Arrington might do at a later Echeles trial undoubtedly would be a matter of some concern to Echeles, but he should not be foreclosed of the possibility that Arrington would testify in his behalf merely because that eventuality was not a certainty. See People v. McCullough, 81 Mich. 25, 45 N.W. 515, 518 (1890); People v. Wells, 272 N.Y. 215, 5 N.E.2d 206 (1936). Moreover, it would in fact seem more likely than not that Arrington would have testified for Echeles for the reason that three times previously, in open court, Arrington had voluntarily exculpated Echeles, apparently contrary to his own penal interest.

Speculation as to whether or not Arrington would claim the privilege at a later Echeles trial has spawned other collateral issues, namely, whether the questions asked at such a later trial would not be within the scope of Arrington's privilege, and whether Arrington had not waived his privilege as a witness by testifying fully about the circumstances on surrebuttal during the narcotics trial. Such questions, speculative as they are, we do not now reach; they can properly be decided if and when they arise in a future proceeding against Echeles. At this juncture, we hold merely that, having knowledge of Arrington's record testimony protesting Echeles' innocence, and considering the obvious importance of such testimony to Echeles, it was error to deny the motion for a separate trial. It should have been clear at the outset that a fair trial for Echeles necessitated providing him the *opportunity* of getting the Arrington evidence before the jury, regardless of how we might regard the credibility of that witness or the weight of his testimony.

This is particularly true where, as here, the opportunity was so readily available —as the court said in Schaffer v. United States, supra, 221 F.2d at 19, reversing because a severance was denied: "There being only two defendants, it would not be very time consuming but entirely practicable to accord them separate trials. * * *"

In reaching this conclusion, we take special note of the fact that during the joint trial of Echeles and Arrington, the Government was permitted to introduce into evidence the incriminatory admissions of Arrington taken from the transcript of the prior narcotics trial, while an objection was sustained precluding Echeles from reading into evidence Arrington's statements protesting the innocence of Echeles contained in the same transcript. While the ruling of the court below as to these evidentiary matters was perhaps the only one possible under the circumstances, it really served to compound the error previously committed and to emphasize that the scales of justice had already been tipped to favor the Government.

The judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

Reversed and remanded.